UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GAYLORD WHITFORD,

              Plaintiff,              CIVIL ACTION NO. 12-14761

     v.                     DISTRICT JUDGE SEAN F. COX

                                     MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 13, 17)

      Plaintiff Gaylord Whitford challenges the Commissioner of Social Security's ("the

Commissioner") final denial of his benefits application. Cross motions for summary judgment

are pending (Dkt. Nos. 13, 17). Judge Sean F. Cox referred the motions to this Magistrate Judge

for a Report and Recommendation (Dkt. No. 3).

## I.      RECOMMENDATION

      Because the Administrative Law Judge ("ALJ") erred in evaluating Plaintiff's credibility,

this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be

**GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the Commissioner's

decision be **REMANDED** for further proceedings consistent with this Report and

Recommendation.

## II.     DISCUSSION

### A. *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a

zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A.  *Administrative Proceedings*

Plaintiff applied for disability insurance benefits on May 5, 2010, alleging a disability onset date of January 1, 2009; the Commissioner denied the application (Tr. 14). Plaintiff appeared with counsel for a hearing before ALJ Jessica Inouye, who considered the case *de novo* (*Id.*). In a written decision, ALJ Inouye found Plaintiff was not disabled (Tr. 14-24). Plaintiff requested an Appeals Council review (Tr. 10). On August 23, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-5).

**B. ALJ Findings**

Plaintiff has a high school education, past relevant work as a machinist, and was 57 years old on his alleged onset date (Tr. 23). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his alleged disability onset date in 2009 (Tr. 16).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: eczema;[1] bilateral hearing loss; post-traumatic stress disorder; depression; and, a history of alcohol abuse (*Id.*).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 17).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> A full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to non-production-oriented, simple, unskilled work. He cannot work in close proximity to others, and should be essentially isolated, with no close proximity to others, occasional supervision, and minimal direct contact with the public. He is limited to work that is low-stress, with only occasional workplace changes or work-related decision making. The claimant should avoid even moderate exposure to hazards, extreme temperatures, humidity, wetness, chemicals, pollutants, and other abrasives that might be inhaled or exposed to the skin. Due to bilateral hearing loss, the claimant should work in an

---

[1] "Atopic dermatitis (eczema) is an itchy inflammation of [the] skin. It's a long-lasting (chronic) condition that may be accompanied by asthma or hay fever. Eczema may affect any area of [the] skin, but it typically appears on [the] arms and behind [the] knees. It tends to flare periodically and then subside. The cause of atopic dermatitis is unknown, but it may result from a combination of inherited tendencies for sensitive skin and malfunction in the body's immune system." *See* http://www.mayoclinic.org/diseases-conditions/eczema/basics/definition/con-20032073 (last accessed January 22, 2014).

environment with no more than moderate noise, and should not be
required to work with his head in an enclosed space.

(Tr. 18-19).

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work

(Tr. 23).

At step five, the ALJ found Plaintiff was not disabled, because he could perform a

significant number of jobs in the national economy (Tr. 23-24).

### C.  Administrative Record

### 1.      Plaintiff's Hearing Testimony and Statements[2]

Plaintiff completed eleven and a half years in school, served in Vietnam, and was

honorably discharged from the military (Tr. 39). He worked as a machinist for the last 18 years

(Tr. 38). Plaintiff stopped working because he spent a lot of time seeking medical treatment for

his skin condition and mental issues, and the lack of work at the factory; he was ultimately laid

off (Tr. 37-38). Plaintiff collected unemployment benefits for almost a year following his lay-off,

and was receiving veteran's disability benefits (Tr. 40).

Because of his PTSD, Plaintiff cannot work with others: he "blow[s] up and [] fl[ies] off

the handle for no reason whatsoever" (Tr. 41). Though he failed to acknowledge his problems for

a while, they began when he returned from Vietnam: he thought his anger was normal, and opted

to live and work with it (Tr. 42, 44). But, his symptoms continued to worsen (Tr. 42). Around

1992, he spent approximately two months in a mental institution for "deprogramming" because

---

[2] Plaintiff's testimony before the ALJ reflects his subjective view of his medical
condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

-6-

of a nervous breakdown, depression, PTSD, and thoughts of suicide; he was told that, while treatment there would help, it would not "sustain [him] the rest of [his] life" (Tr. 42, 60-61).

When Plaintiff returned to work, he isolated himself from coworkers and, even when working alone, found it difficult to interact with others when he needed his work reviewed (Tr. 44-45, 61). He got along well enough with people to sustain a long career; he simply feels better, more secure, when he is alone (Tr. 45). The local Veterans Affairs ("VA") clinic – where he receives most of his treatment – has prescribed Plaintiff medication for anxiety and PTSD (Tr. 40, 43). Once his medication takes effect (an hour or so after he wakes), he is able to communicate with others, but feels like he is in a fog: he stumbles over his words and is unable to think and speak quickly (Tr. 43-44).

Plaintiff also has depression: for most of his career, he has had daily thoughts of suicide or harming others (Tr. 45-46). But, he has been able to suppress these thoughts (Tr. 46). During the hearing, Plaintiff became aggravated by the ALJ's questions, and referred to her as "hon"; this instance reflects his behavior in the workplace – he says inappropriate things without thinking first (Tr. 67).

Plaintiff's skin condition also prevents him from working (Tr. 41). He began experiencing skin problems when he returned from Vietnam in 1970 (Tr. 47). The precise cause of his eczema is unknown: his doctors have noted a combination of factors, including anxiety, depression, PTSD, nerves, and working in "bad conditions" (Tr. 47-48). A doctor told Plaintiff that if he wanted to be cured, he had to avoid sunlight and stop working the way he was working (Tr. 48-49).[3] For 14 days, he took Vancomycin[4] and stayed in bed; his condition improved, but he had to return to work (Tr. 48-49).

---

[3] Treatment notes show that Plaintiff reported being a workaholic before being laid off.

During his testimony, Plaintiff described the effects of his eczema: he had scabs across his forehead, down the sides of his nose, and on the top of his head; a breakout on his neck; and, rashes or lesions on his scalp, forehead, cheeks, neck, lower back, thighs, legs, and the sides of his face (Tr. 46, 61-62). In 1992, he broke out so severely on his hands that his fingernails nearly fell off; to this day, his fingernails are distorted (Tr. 64-65).

Plaintiff takes Methotrexate[5] for his eczema, but the severity of his rashes waxes and wanes: he takes his medication on Tuesday and his skin clears up a little bit day by day, but by Monday he starts breaking out again (Tr. 62-63). Plaintiff also uses a steroid cream and other ointments that he applies once or twice a day (Tr. 68). He always experiences the sensation of bugs underneath his skin; it is an itching he cannot ignore – he is distracted during normal activities and often scratches until his skin bleeds and scabs (Tr. 63-64). He takes Atarax[6] multiple times a day for his itching (Tr. 63).

---

[4] "Vancomycin is used to treat colitis (inflammation of the intestine caused by certain bacteria) that may occur after antibiotic treatment. Vancomycin is in a class of medications called glycopeptide antibiotics. It works by killling bacteria in the intestines." *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604038.html (last accessed January 22, 2014).

[5] "Methotrexate is used to . . . control symptoms of severe psoriasis in adults who have not been helped by other treatments. [It] belongs to the group of medicines known as antineoplastics (cancer medicines). It blocks an enzyme that is needed by cells to live. This interferes with the growth of cancer cells, which are eventually destroyed by the body. For patients with arthritis or psoriasis, methotrexate may work by improving the immune system." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011139/?report=details (last accessed January 22, 2014).

[6] "Treats anxiety, tension, nervousness, nausea, vomiting, allergies, skin rash, hives, and itching. This medicine is an antihistamine." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010631/ (last accessed January 22, 2014).

-8-

The ALJ asked about the factors that – in light of medical records that demonstrate Plaintiff's improved condition in the year preceding his hearing – would aggravate Plaintiff's condition and impede his ability to work (Tr. 50). Plaintiff agreed that, in the last year he had recovered up to 90 percent from a serious outbreak; but if he were in sunlight, he would break out (Tr. 56). Plaintiff explained that sweating causes rashes throughout his body that constantly itch; he cannot sit still – he often must stand up or sit down to scratch whatever part of his body irritates him (Tr. 51-52). The only relief Plaintiff has is when he takes his sleeping pill and falls asleep (Tr. 66). His skin condition is also irritated by movement (e.g., bending and twisting); he cannot move much comfortably during the day because he sweats profusely (Tr. 65). Plaintiff cannot use solvents, oil, or any other kind of irritable solution (Tr. 41).

Plaintiff also has hearing problems: he has sometimes misheard questions and if he is enclosed in a small space, or if something is too close to his head, his hearing aids cause his ears to ring (Tr. 41-42, 58). When he was working, he sometimes wore earplugs (though they did not always protect him from unexpected loud noises) and was sometimes unable to hear all workplace dangers (Tr. 59-60).

Plaintiff has stiffness in his joints (Tr. 41). He has not sought medical treatment for this, and is unsure of the causes, but it causes him difficulty with most physical activity: he has trouble grasping and holding on to things; he cannot bend over, sit, or stand for very long; he has not taken his boat out in five years (though he was working two years ago); and, he cannot fish (he can't reel in a reel or bait a hook) (Tr. 41, 52-53, 64). The ALJ asked Plaintiff to reconcile his reported activities – as described in his July 2010 psychological consultative examination – with his testimony; he had listed bow-hunting, fishing, working in the yard, housework, and wood chopping (Tr. 53-55) Plaintiff explained that he "had no hearing aids at the time" and had trouble

hearing the question: he thought the question asked what he *used* to do before he began to experience physical difficulties (*Id*.). He was astonished when he read the consultative psychological report; he had stopped these activities when he broke out severely (Tr. 55-56).

Plaintiff lives in a house with his girlfriend, Betty Jo (Tr. 36). Plaintiff occasionally does dishes – using mild soap – but he does not do much else around the house; Betty Jo and her granddaughter take care of most of the housework (Tr. 57). During the day, he watches some television; he sometimes sleeps for long periods of time because his medication makes him tired (Tr. 57-58).

### 2.        Relevant Medical Evidence

On May 5, 2009, Plaintiff presented to the emergency room with contact dermatitis[7] and eczema; he was unable to concentrate until his skin condition was under control (Tr. 281-82). He received a methylprednisolone injection (*Id*.).

On July 7, 2009, Plaintiff presented for a dermatology consult: he reported an itchy, painful, red rash that had been waxing and waning since January; his physician diagnosed him with flaring eczema (Tr. 472). He was placed on a topical steroid and an antihistamine regimen (Tr. 473). On August 10, 2009, Plaintiff called to report that the medications had cleared his eczema (Tr. 474).

On December 28, 2009, Plaintiff presented to Thomas F. Tumicki, LMSW, for a mental health consult: he was having nightmares of the Vietnam War; had difficulty concentrating; felt very nervous and angry; and, had rashes – he wanted to "peel the skin off [his] body" (Tr. 263-

---

[7] "Contact dermatitis is a kind of skin inflammation that occurs when substances touching [the] skin cause irritation or an allergic reaction. The resulting red, itchy rash isn't contagious or life-threatening, but it can be very uncomfortable . . . ." *See* http://www.mayoclinic.org/diseases-conditions/contact-dermatitis/basics/definition/con-20032048 (last accessed January 22, 2014).

70). He noted that he had received previous outpatient mental health treatment and completed a residential program at Battle Creek for combat veterans (Tr. 265, 269). He listed yard work, hunting, fishing, and working around the farm among his activities (Tr. 265). He was diagnosed with PTSD (combat), depression, anxiety, and anger outbursts, and assigned a GAF of 50 (Tr. 270).[8]

That same day, Plaintiff presented for a psychiatric evaluation with Janet M. Legacy, RN, MSN, C-NP (Tr. 342-46). He reported anxiety and sleep problems since returning from Vietnam; nightmares and flashbacks; hospitalization 15 years ago in the Battle Creek VA hospital in the combat veteran program; a history of drinking to aid his sleep; feelings of hopelessness; and, no suicidal ideations (Tr. 342). Plaintiff's symptoms included depression; blunted affect; hyperactivity; physical health problems; sleep disturbance; hopelessness; intrusive thoughts about traumatic experiences; memory problems; and, hypervigilance (Tr. 343-44). He was diagnosed with chronic PTSD and assigned a GAF of 55 (Tr. 345).

---

[8] The GAF score is:

> a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 n. 7 (6th Cir. 2006).

On January 11, 2010, Plaintiff presented with severe eczema on 85% of his total body surface area ("TBSA") and was admitted to the hospital for modified Goeckerman treatment (Tr. 420).[9] He had run out of his medications and was only using Vaseline (Tr. 467). Plaintiff was able to perform activities of daily living; appeared very uncomfortable – he was unable to sit still in bed and was itching; complained of insomnia; stated he was so miserable that he wanted "to put a gun to his head"; and, denied suicidal ideations or plans (Tr. 464-567). He was discharged on January 15 (Tr. 420).

On January 21, 2010, Plaintiff reported continued mild itchiness, but was overall vastly improved with few lesions; general erythema and scaling encompassed approximately half of his TBSA (Tr. 420-21). He had received phototherapy the previous three days (*Id.*). Plaintiff was advised to avoid hot showers, use mild soap, moisturize at least twice daily, and follow through with an antibiotic, prednisone, and his topical regimen (Tr. 421-22). He had no pain (Tr. 422).

On January 22, 2010, Plaintiff was admitted to the hospital for a modified Goeckerman regimen (Tr. 375). Treatment notes include his narrative of the problem: he was experiencing a flare that had been getting progressively worse since July of 2009; it initially responded to treatment – in September, it had been limited to a few spots on his legs and arms – but it had progressively worsened since then (*Id.*). He reported pain at a ten out of ten – his rash had never been so painful, itchy, or as widely distributed over his body; he was no longer taking medication for his itching, had not used creams for his rash in at least three days, and was out of all other medications (*Id.*).

---

[9] "Goeckerman therapy typically involves receiving ultraviolet (UV) light treatment and applying a prescription coal tar mixture to the psoriasis. The coal tar mixture usually remains on the skin for several hours." *See* http://www.skincarephysicians.com/psoriasisnet/Goeckerman_therapy.html (last accessed January 22, 2014).

On January 28, 2010, Plaintiff was seen for a psychiatry medication review: he was very pleased with how he was feeling; he still had occasional feelings of hopelessness, but was much less anxious and depressed (Tr. 334). He believed his improved anxiety had likewise helped his skin condition – it was greatly improved (*Id.*). Examination revealed no signs of distress; normal motor behavior; cooperative attitude; normal and responsive facial expression; appropriate affect; calm mood; normal attention and concentration; intact memory; and good insight and judgment (Tr. 334-35).

On February 18, 2010, Plaintiff presented with a generalized, itchy, painful red rash that has been waxing and waning over the past few weeks; he rated his pain at a four (Tr. 319-21).

On March 19, 2010, Plaintiff was seen for a psychiatry medication review; he was on Celexa,[10] Clonazepam,[11] and Seroquel,[12] and reported no side effects (Tr. 312). He reported overall improvement in his anxiety; difficulty falling asleep; improved mood; no feelings of hopelessness or suicidal thoughts; and was positive and future-oriented (*Id.*). Examination

---

[10] "[Celexa] is used to treat depression. It belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs). These medicines are thought to work by increasing the activity of a chemical called serotonin in the brain." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/?report=details (last accessed January 22, 2014).

[11] "Clonazepam is used . . . used to treat panic disorder in some patients. Clonazepam is a benzodiazepine. Benzodiazepines belong to the group of medicines called central nervous system (CNS) depressants, which are medicines that slow down the nervous system." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009677/?report=details (last accessed January 22, 2014).

[12] "Seroquel (quetiapine) is an antipsychotic medicine. It works by changing the actions of chemicals in the brain. Seroquel is used to treat schizophrenia[;] . . . bipolar disorder (manic depression)[; and] . . . is also used together with antidepressant medications to treat major depressive disorder in adults." *See* http://www.drugs.com/seroquel.html (last accessed January 22, 2014).

revealed no signs of distress; cooperative attitude; appropriate affect; calm, cheerful mood; no hallucinations; normal concentration; intact memory; and, good judgment and insight (Tr. 312-13). Nurse Practitioner Legacy concluded that he was much improved; she increased his Seroquel prescription, assigned a GAF of 60, and advised him to return in 8 weeks (Tr. 313).

On March 29, 2010, Plaintiff attended an initial therapy session with Gwen Hoff, LMSW: he reported pain at a nine out of ten; passing suicidal thoughts related to his itching, but no plan or intent; irritability; nightmares; and, frequent intrusive recall (Tr. 305-06). His medication was helping (*Id.*). Hoff noted that Plaintiff was anxious, frustrated, and spent much of his session itching and writhing around from discomfort (Tr. 306).

On April 1, 2010, Plaintiff's rash returned: it was generalized, moderate, had lasted at least one month, and involved itching, bleeding, and swelling (Tr. 298). He was diagnosed with severe atopic dermatitis and prescribed steroids (Tr. 300).

On April 26, 2010, Plaintiff was admitted to the hospital; he was diagnosed with erythroderma (secondary to longstanding history of eczema) and bacteremia[13] (polymicrobial with positive methicillin resistant staphylococcus aureus (MRSA) and group G streptococcus) (Tr. 370). He reported that he had developed a coin-size spot of erythema[14] on his hand earlier that month; while steroids had initially resolved his symptoms, the erythema had returned and

---

[13] "Bacteremia is the presence of viable bacteria in the circulating blood. Most episodes of occult bacteremia spontaneously resolve, particularly those caused by Streptococcus pneumoniae and Salmonella, and serious sequelae are increasingly uncommon. However, serious bacterial infections occur, including pneumonia, septic arthritis, brain abscesses, osteomyelitis, cellulitis, meningitis, and sepsis, possibly resulting in death." http://emedicine.medscape.com/article/961169-overview (last accessed January 20, 2014).

[14] "Erythema is a skin condition characterized by redness or rash." *See* http://umm.edu/health/medical/altmed/condition/erythema (last accessed January 16, 2014).

-14-

progressed to his arms, chest, back, and lower extremities (Tr. 370-71). Plaintiff reported that his flares had previously happened annually, and were restricted to his hands; but his flares had become more frequent and diffuse over the last two years (Tr. 413-14). He stated that he had been experiencing eczema flares every two to three months – most recently in January of 2010 – involving most of his body (Tr. 371). Plaintiff presented with chills and erythroderma,[15] confluent erythema/scaling, and overlying excoriations affecting 90% of his TBSA (Tr. 416-17).

Plaintiff was discharged on May 4, 2010 in stable condition after "great improvement" with therapy that involved ointments, a sauna suit, and phototherapy (Tr. 372). UV treatment nearby was recommended, but Plaintiff explained that he was not interested in traveling very far, and did not have insurance for treatment with a private dermatologist (Tr. 372).

On May 19, 2010, Plaintiff treated with social worker Hoff (Tr. 520-22). He reported his pain as a six out of ten and stated that he could not concentrate until his skin condition was in remission; therapy sessions were put on hold until Plaintiff could stabilize his chronic, debilitating skin condition (Tr. 520, 532). He expressed frustration and noted his recent hospitalization for an infection secondary to severe eczema; Plaintiff was to be started on Methotrexate – he was waiting for his medication to arrive in the mail (Tr. 522, 532). Hoff noted a diagnosis of chronic PTSD and assigned a GAF of 58; medication was helping with his sleep problems (Tr. 526, 532). Examination revealed normal motor behavior; apprehension; normal

---

[15] "Erythroderma is the term used to describe intense and usually widespread reddening of the skin due to inflammatory skin disease. It often precedes or is associated with exfoliation (skin peeling off in scales or layers) when it may also be known as exfoliative dermatitis (ED). It is sometimes called the 'red man syndrome' when no primary cause can be found (idiopathic erythroderma)." *See* http://www.dermnetnz.org/reactions/erythroderma.html (last accessed January 16, 2014).

and responsive facial expression; cooperative attitude; appropriate affect and calm mood; normal

attention and concentration; intact memory; and, good judgment and insight (Tr. 528).

On June 30, 2010, Plaintiff presented with an upper respiratory infection; treatment notes

indicate significant improvement in his eczema with methotrexate, and Plaintiff indicated that his

quality of life was much improved (Tr. 518).

On July 19, 2010, Plaintiff appeared for a psychiatry medication review with Nurse

Practitioner Legacy; he continued to take Celexa, Clonazepam, and Seroquel (Tr. 512). He

believed the medications were starting to help and reported no side effects; a satisfactory mood

with no feelings of hopelessness or suicidality; and, less anxiety overall (Tr. 512-14). Plaintiff

had no active lesions, but continued to experience an ongoing itchy sensation (*Id.*). Legacy

assigned a GAF of 60 (Tr. 514).

On July 22, 2010, Plaintiff presented to George Pestrue, Ph.D., for a consultative

examination (Tr. 476-82). He was irritable, partially due to his eczema (it was "getting to the

point where it's impossible for [him] to work without injuring [him]self or someone else");

became angry multiple times a day at the simplest of things; felt depressed and tired most of the

time; had poor appetite, bad nightmares almost every night, vivid flashbacks up to three times a

week, and suicidal thoughts, but no plans; heard voices; and, was anxious, impulsive, and easily

startled (Tr. 476, 478-49). He got along with people most of the time, but avoided socialization

and crowds; he believed his PTSD symptoms had worsened (Tr. 476). Plaintiff stated he watches

television; had gone fishing the previous winter and bow hunted the previous year; and, fixed

ceramic tiles in the house the day before (Tr. 478). Upon examination, Plaintiff was alert, but

strongly anxious; had tense and moderately depressed facial expression and a moderately

depressed mood; and, was friendly, cooperative, verbal, and very spontaneous (Tr. 479). He was

-16-

strongly fidgety and continuously in motion throughout the examination (*Id.*). Dr. Pestrue stated that "[Plaintiff] described having angry outbursts and at times during this evaluation appeared to be on the verge of blowing up but did not express anger towards this examiner" (Tr. 480). Dr. Pestrue concluded that Plaintiff's PTSD symptoms, mood swings, and social anxieties will make it very difficult for him to work in social situations (Tr. 482). He diagnosed PTSD; major depression, single episode, severe, with auditory hallucinations; social anxiety disorder; rule out bipolar disorder; and, assigned a GAF of 48 (*Id.*).

On August 16, 2010, Bruce G. Douglass, Ph.D., completed a psychiatric review technique form (Tr. 492-95). He opined that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and, get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 492-93). He concluded that Plaintiff retained the capacity to perform simple, routine, 2-step tasks on a sustained basis (Tr. 494).

On September 20, 2010, Plaintiff appeared for a psychiatry medication review (Tr. 510). His eczema continued to be controlled with Methotrexate, and this contributed positively to his mental health; he slept pretty well, though his Seroquel dosage was increased to help him to fall asleep faster; he was positive and future-oriented; and, he tried to incorporate daily walking into

-17-

his routine to help with his anxiety management (*Id*.). Nurse Practitioner Legacy indicated that Plaintiff had "pretty good stability" (Tr. 512).

On November 1, 2010, Plaintiff presented to Alyssa Beebe, N.P., for a follow-up exam: he was in no apparent distress; extensive eczema that was previously noted was no longer evident, though he had some areas of dry patchiness; and, he had no erythema (Tr. 508). Plaintiff indicated that his Methotrexate was working well; he continued to take Atarax and use moisturizers for itching (Tr. 509). He was doing well with respect to his PTSD and denied suicidal thoughts (Tr. 510).

On January 25, 2011, Plaintiff presented for a psychiatry medication review: he reported stable mood and a much improved quality of life (Tr. 516). Methotrexate had stabilized his eczema to a large degree, but he was still experiencing some breakouts and felt concerned about the wear and tear of the treatment on his systems (Tr. 516-18). Examination revealed normal motor behavior; no distress; cooperative attitude and general behavioral tone; normal and responsive facial expression; appropriate affect; calm mood; normal concentration; intact memory; and, good judgment and insight (Tr. 506, 516). It was noted that Plaintiff evidenced good stability of his current regime; he was to return for medication review in three months (Tr. 506).

### D.  Plaintiff's Claims of Error

#### 1.        Plaintiff's Credibility

Plaintiff argues that the ALJ erred in evaluating Plaintiff's subjective complaints of disabling symptoms. This Magistrate Judge agrees.

The Sixth Circuit has recently instructed ALJs on how to assess a claimant's credibility:

-18-

Credibility determinations regarding the applicant's subjective complaints of pain rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence. In assessing an individual's credibility, the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged . . . . Next, the ALJ must evaluate the intensity, persistence, and functional limitations of the symptoms by considering objective medical evidence, as well as: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions.

*Johnson v. Comm'r of Soc. Sec.*, __ F. App'x __, 2013 WL 5613535, at *8 (6th Cir. Oct.15, 2013) (internal citations and quotations omitted). The ALJ is not required to address every factor; he need only identify specific reasons for his credibility determination – supported by evidence in the record – and clearly state the weight he gave to Plaintiff's statements and the reasons for that weight. *Potter v. Colvin*, No. 3:12–CV–202, 2013 WL 4857731, at *13 (E.D. Tenn. Sept.11, 2013) (citing SSR 96–7p, 1996 WL 374186, at *2 (1996); *Tell v. Comm'r of Soc. Sec.*, No. 11–15071, 2012 WL 3679138, at *11 (E.D. Mich. July 13, 2012)). Furthermore, "[c]redibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ." *Strevy v. Comm'r of Soc. Sec.*, No. 1:12–cv–634, 2013 WL 54472803, at *8 (W.D. Mich. Sept. 30, 2013) (citing *Gooch v. Sec'y of HHS*, 833 F.2d 589, 592 (6th Cir. 1987)).

The ALJ first found that Plaintiff had medically determinable impairments that could reasonably be expected to cause his alleged symptoms (Tr. 19). However, in his evaluation of Plaintiff's subjective complaints, the ALJ did not find his statements concerning the intensity,

persistence, and limiting effects of his symptoms credible to the extent that they were inconsistent with the RFC (*Id.*).

### a.        Eczema

Plaintiff argues that, in improperly discounting his credibility, the ALJ formulated an RFC that failed to adequately account for his severe eczema and contact dermatitis (Dkt. No. 13 at p. 10).[16]

Plaintiff first makes the overarching argument that the ALJ erred by basing the RFC on periods of time during which his condition was in remission (Dkt. No. 13 at p. 8). He relies on *Wilcox v. Sullivan*, in which the Sixth Circuit stated that, in evaluating "any [] episodic disease, consideration should be given to the frequency and duration of the exacerbations, the length of remissions, and the evidence of permanent disabilities." 917 F.2d 272, 277 (6th Cir. 1990). More importantly, and as Plaintiff acknowledges, *Wilcox* found that the ALJ had erred in considering that the claimant – who suffered from multiple sclerosis – had worked during periods of remission. *Id.*; *see also Shaw v. Sec'y of Health & Human Servs.*, 978 F.2d 1259, at *1 (6th Cir. 1992) ("Because the . . . period wherein [the claimant] attempted to work and attend school was unquestionably a period of remission, we believe the ALJ erred in placing undue reliance on this brief and temporary interruption of [her] progressively disabling [multiple sclerosis]." (internal citations omitted)); *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 530-31 (6th Cir. 1992) (the capacity to pass one to two law school classes per semester did not indicate that claimant, who suffered from chronic fatigue syndrome, was capable of sustaining substantial gainful employment in the national economy).

---

[16] All page numbers refer to CM/ECF pagination.

This Magistrate Judge acknowledges that the severity of Plaintiff's eczema has varied throughout the course of the relevant time period. But the ALJ did not limit her inquiry to the periods of time in which Plaintiff's symptoms had subsided. Nor does this set of facts involve a question of whether the ALJ impermissibly accounted for Plaintiff's return to work during periods of time where he had reported significant improvement in his symptomology – he has not worked since his alleged onset date.

Plaintiff next argues that the ALJ erroneously construed various parts of the record in reaching her credibility determination. The ALJ ultimately concluded that "because [his] eczema has been largely responsive to treatment, the undersigned finds his testimony regarding the frequency and intensity of his flare-ups less than fully credible" (Tr. 20). In so finding, however, the ALJ's analysis involves a series of errors. The ALJ noted Plaintiff's extensive treatment for eczema – including "several hospitalizations during the relevant time period" (Tr. 19). She then elaborated:

> Although [Plaintiff] testified that he currently takes methotrexate weekly, and it is effective for only a few days before his eczema flares again, his treatment records do not show such a pattern. For example, in November 2010, Alyssa Beebe, N.P., who examined the claimant, noted no evidence of eczema or erythema. On examination in January 2011, the claimant's eczema was also observed to be greatly improved. The undersigned also notes that the claimant's one extended hospitalization, in April 2010, related to the development of a bacterial infection, rather than ongoing treatment for his eczema. Even so, the claimant was discharged in good condition within 10 days of his admission to the hospital.

(Tr. 19-20).[17]

Treatment notes in January of 2011 do not contain such language; they actually found Plaintiff's eczema to be stabilized to a large degree, but noted that Plaintiff was still experiencing

---

[17] The ALJ's citations to the record are likewise unhelpful. Here, she cites to two separate exhibits without indicating any specific page numbers: one 38 pages in length, the other 122.

some breakouts (Tr. 516-18). This *is* consistent with Plaintiff's testimony about the cyclical effect of Methotrexate (Tr. 62-63). Meanwhile, January 28, *2010* treatment notes specifically indicate that Plaintiff's condition had "greatly improved" (Tr. 334). Notably, this was shortly after Plaintiff's four-day hospitalization in January of 2010 and the intensive treatment that accompanied it, and months before Plaintiff began treatment with Methotrexate: the record indicates that Plaintiff began regular treatment with Methotrexate no earlier than April of 2010.[18] Furthermore, although Plaintiff's hospitalization in April of 2010 did involve a bacterial infection, it was a bacterial infection in Plaintiff's bloodstream – secondary to his severe eczema outbreak (Tr. 370, 522).

While taken separately, each of the ALJ's misconstructions of the evidence might not reflect error in the ALJ's analysis or a lack of substantial evidence. But multiple errors in the ALJ's reading of the evidence necessarily beg the question of whether the ALJ closely construed the record as a whole when making her credibility determination. Moreover, absent these errors, it is unclear whether the ALJ would have reached the same conclusion. It is hard to imagine that the ALJ's discount of Plaintiff's testimony regarding the frequency and intensity of his flare-ups did not color the remainder of her impressions of the testimony and evidence.

This impression is apparent in the ALJ's treatment of evidence relevant to Plaintiff's reported physical limitations, which the ALJ likewise found not entirely credible (Tr. 20). For example, the ALJ stated that the only activity restriction given by Plaintiff's physicians was to avoid hot showers and harsh soaps (Tr. 20). But this is not clearly relevant to any activity restriction; it is more reasonably interpreted as advice Plaintiff should follow to avoid further

---

[18] Plaintiff reported in May of 2010 that he had responded positively to Methotrexate while in the hospital, and was waiting for his Methotrexate prescription to arrive in the mail (Tr. 522).

irritation of his skin, akin to a physician telling a patient with a peanut allergy to stay away from the jar of peanut butter. As Plaintiff points out, it is unlikely that a physician would make a notation advising him to avoid twisting or turning because such movements do not trigger his eczema; they reportedly exacerbate whatever discomfort he is already in.

The ALJ also considered Plaintiff's work history: "[m]ost significantly, [Plaintiff] continued to work for 30 years after the alleged onset of his eczema, and did not testify to any change in his condition resulting in an inability to work" (Tr. 20). Plaintiff argues that "Plaintiff's ability to work for 30 years prior to the onset of his severe flare-ups in 2009 has no relationship to the credibility of Plaintiff's description of his symptoms after the onset of his flare-ups in 2009" (Dkt. No. 13 at p. 13). This Magistrate Judge agrees: such a long work history is not indicative of someone attempting to avoid work. *See Felisky v. Bowen*, 35 F.3d 1027, 1040 (6th Cir. 1994) (the claimant's 17 year work history supported her credibility). Moreover, Plaintiff points to treatment notes indicating that, in April of 2010, he had reported that he had experienced progressively more severe eczema over the previous two years: he previously experienced flares annually, and they were limited to his hands;[19] but his flares had become more frequent and diffuse over the last two years (Tr. 413-14).

The ALJ also found Plaintiff's explanation – that he had trouble hearing Dr. Pestrue's questions because he did not have his hearing aid – for a discrepancy in the daily activities he reported during his consultative exam to be less than credible, partially because Plaintiff's medical records showed that Plaintiff had received his hearing aids prior to the July 2010 consultative examination (Tr. 20). Meanwhile, medical records indicate that Plaintiff was having

---

[19] Plaintiff did not testify explicitly to this pattern over time. But, consistent with this pattern, Plaintiff testified to eczema outbreaks on his hands that had caused him difficulty while he was still working (Tr. 64-65).

trouble with his hearing aid in the month prior to his evaluation with Dr. Pestrue – it kept shutting off (Tr. 519). And, Plaintiff points to his June 7, 2010 function report, where he described limited activities that corroborate his testimony (Tr. 183-90). Without errors in her assessment of the record, it is conceivable that the ALJ would have resolved a perceived discrepancy in Plaintiff's favor. In a close case, a careful and accurate analysis of the evidence relied upon in reaching a credibility determination can be all the difference.

It is clear from the records that Plaintiff's eczema was intermittently severe, particularly before he began taking Methotrexate. As Defendant notes, "[t]here are no records showing that "Plaintiff's skin condition worsened after January 2011" (Dkt. No. 17 at p. 11). Meanwhile, Plaintiff suggests that "some" breakouts nevertheless denote a condition sufficiently severe to undermine the ALJ's analysis of the medical evidence. As such, the ALJ should reassess Plaintiff's credibility, and consider whether, if not applicable to the entire relevant time period, a reevaluation of the evidence at hand implicates a period of disability before Plaintiff began treatment with Methotrexate.

**b.       PTSD**

Similarly, Plaintiff argues that the ALJ erred in his evaluation of the severity of his complaints of PTSD.

The ALJ first stated that "[t]he record as a whole [] does not support greater limitations than those above with respect to [Plaintiff]'s alleged mental limitations (Tr. 21). In assessing the credibility of Plaintiff's mental impairments, the ALJ noted as significant that the record showed no treatment for psychiatric symptoms until December of 2009; this, she stated, "weigh[ed] against the credibility of [Plaintiff's] allegations of long-standing PTSD and other impairments" (Tr. 21).

-24-

But, failure to seek mental health treatment is not a basis on which to significantly discount Plaintiff's reports of disabling mental health impairments. "[A] claimant's failure to seek formal mental health treatment is 'hardly probative' of whether the claimant suffers from a mental impairment, and 'should not be a determinative factor in a credibility assessment[.]'" *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 493 (6th Cir. 2011) (internal citations omitted); *see also Blankenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir.1989) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."). Moreover, on December 28, 2009, Plaintiff reported a history of mental health treatment that involved a residential program at Battle Creek for combat veterans and previous psychiatric prescriptions (Tr. 265-66). While these instances were prior to the relevant time period, Plaintiff's statements as to this period of treatment are reported consistently throughout the record.

Thus, the reassessment of Plaintiff's credibility should not be limited to Plaintiff's eczema. The ALJ found – and a careful review of the record evidence reveals – that Plaintiff's "improvement in his mental symptoms[] generally coincid[ed] with improvements in his eczema" (Tr. 21). As such, any credibility finding with respect to Plaintiff's eczema is likely to directly affect the ALJ's credibility determination as it relates to his mental health impairments.

### 2.        Plaintiff's Remaining Arguments

Plaintiff next asserts additional errors: namely, that the ALJ failed to give sufficient credence to (1) the GAF scores assessed by evaluating physicians; and, (2) the findings of the Veterans Administration in Plaintiff's separate veteran's disability claim. However, because a reevaluation of Plaintiff's credibility as it relates to his eczema and PTSD may implicate other

-25-

parts of the ALJ's analysis – including Plaintiff's RFC and a potential finding of disability – this Magistrate Judge need not address these remaining arguments.[20]

## IV.    CONCLUSION

Because the ALJ erred in evaluating Plaintiff's credibility, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the Commissioner's decision be **REMANDED** for further proceedings consistent with this Report and Recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of HHS,* 932 F.2d 505 (6th Cir.1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

---

[20] Plaintiff also makes reference in his motion to medical evidence dated August of 2011; the ALJ's decision was rendered in June of 2011. *See Mathews v. Weber*, 423 U.S. 261, 270 (1976). Defendant interprets this as an implicit request that this Court grant Plaintiff a remand pursuant to sentence six of 42 U.S.C. § 405(g). To the extent that this is what Plaintiff intends, he fails to substantiate any argument accordingly. As such, any purported request for a sentence six remand is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  January 22, 2014

### Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 22, 2014, by electronic and/or ordinary mail.

s/Eddrey Butts
Case Manager for Magistrate Judge Mark A. Randon